IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM E. LOUIS, | ) | CASE NO. 1:12CV2182 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, [1] | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff William E. Louis ("Plaintiff" or "Louis") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381, *et seq.*  Doc. 1.  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 14.  For the following reasons, the final decision of the Commissioner is **AFFIRMED.**

## I. Procedural History

Louis filed an application for SSI on July 16, 2009, alleging a disability onset date of August 12, 2008.  Tr. 147, 168.  He claimed that he was disabled due to a number of impairments, including back pain, equilibrium being off, hypertension, bronchitis, paranoid schizophrenia, hallucinations, and being a slow learner.  Tr. 78-92, 168.  Louis' application was denied initially and on reconsideration.  Tr. 72-78.  At Louis' request, on May 20, 2011, a hearing was held before Administrative Law Judge Julia A. Terry (the "ALJ").  Tr. 28-56.  On June 23, 2011, the ALJ issued a decision finding that Louis was not disabled.  Tr. 15-32.  Louis requested review of the ALJ's decision by the Appeals Council July 11, 2011.  Tr. 144.  On June

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is hereby substituted for Michael J. Astrue as the Defendant in this case.

1

22, 2012, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.[2]

## II. Evidence

### A. Background

Louis was born on July 27, 1959, and was 49 years old on the date that he filed his application for SSI. Tr. 21. He graduated from high school and worked previously as a general laborer and a commercial cleaner. Tr. 36, 153-57, 173. At the time of the hearing, he lived alone in an apartment he obtained through the Cuyahoga Metropolitan Housing Authority. Tr. 40.

### B. Medical Evidence [3]

#### 1. Physical Impairments

##### a. Treatment History

Louis has a history of back pain that dates back to a work-related injury in 1995. Tr. 223. This condition was aggravated in 2003 when he was attacked by a group of men. Tr. 45, 223. Louis sought treatment for his back pain as well as for his other physical impairments, including his bronchitis and hypertension, at Care Alliance. Tomas Gigena, M.D., a general practitioner, was Louis' primary care physician at Care Alliance. At an appointment with Dr. Gigena on July 13, 2009, Louis did not report any back pain. Tr. 219. However, at an appointment with Dr.

---

[2] Previously, in 2003, Louis applied for SSI and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act), 42 U.S.C. §§ 416(i) and 423. Tr. 60. In both applications, he alleged a disability onset date of July 1, 2001. Tr. 60. In a decision dated August 13, 2008, an ALJ found that Louis had the severe impairments of borderline intellectual functioning, a disorder of the back, and alcohol abuse disorder. Tr. 63. The ALJ found that, while Louis was abusing drugs and alcohol, he was disabled and incapable of performing work at a substantial gainful level. Tr. 66. However, the ALJ further found that, if Louis stopped his substance abuse, he could perform medium work and was capable of performing work that existed in significant numbers in the national economy. Tr. 68-70. Thus, the ALJ concluded that, because Louis would not be disabled if he stopped his substance use, the substance use disorder was a contributing factor material to the determination of disability and, as a result, Louis was not disabled within the meaning of the Social Security Act. Tr. 70-71.

[3] For his SSI claim, Louis has the burden to demonstrate disability during the period of July 16, 2009, the date he filed his current application for benefits, to June 23, 2011, the date of the ALJ's decision. SSI benefits are only payable as of the month after the month in which the application is filed. 20 C.F.R. §§ 416.335, 416.501.

Gigena on July 27, 2009, one week after he filed his SSI application, Louis reported back pain, which he rated at 7 out of 10.  Tr. 220.  Louis saw Dr. Gigena again on August 17, 2009, for a follow-up appointment and complained about hypertension and back pain.  Tr. 218, 275.  He rated his back pain at 7 out of 10.  Tr. 275.  On October 1, 2009, Louis presented to Dr. Gigena with paperwork for his disability claim.  Tr. 277.  At that appointment, Louis complained of back pain and rated his pain at 9 out of 10.  Tr. 277.

After a five-month hiatus, Louis returned to Care Alliance on March 1, 2010, for a refill of his blood pressure medication and reported no back pain.  Tr. 278.  Louis then presented to Care Alliance with paperwork for his disability claim on May 4, 2010.  Tr. 279.  At that appointment, Louis reported back pain and rated it at 7 out of 10.  Tr. 279.  After his May 2010 appointment, Louis did not return to Care Alliance until October 22, 2010.  Tr. 302.  At that time, Louis complained of chronic back pain and stated that the pain was worse when he was sitting. Tr. 302.  The examiner diagnosed Louis with lumbar strain and provided him with home exercises to help improve his back pain.  Tr. 302.

On March, 15, 2011, Louis presented to Care Alliance with paperwork for his disability claim.  Tr. 305.  Louis reported that he had no back pain.  Tr. 305.  The examiner noted normal range of motion in the low back and negative straight leg raises.  Tr. 305.  In addition, the examiner noted that Louis had normal motion in the hips, knees, shoulders, elbows, and wrists.  Tr. 305.  The examiner found that Louis had "no physical disability."  Tr. 305.  On May 11, 2011, Louis again presented to Care Alliance with paperwork for his disability claim.  Tr. 306.  He complained of back pain and rated it at 7 out of 10.  Tr. 306.  The examiner noted that Louis' hypertension and pulmonary disease were controlled with medication.  Tr. 306.

### b. State Agency Consulting Physician

At the state agency's request, Louis saw Eulogio Sioson, M.D., for a consultative examination on September 28, 2009. Tr. 223-29. Dr. Sioson observed that Louis walked slowly with no limp and no assistive device. Tr. 224. A blood pressure reading measured 140/90. Tr. 224. Dr. Sioson noted that Louis was able to get up and down from the examination table without difficulty but that he lost his balance while attempting to do heel/toe walking. Tr. 224. The physical examination also revealed no edema in the extremities and no gross deformity in the joints. Tr. 224. Dr. Sioson noted minimal mid and lower back tenderness and a straight leg raising test was negative. Tr. 224. He diagnosed Louis with hypertension/bronchitis, back pains, and depression. Tr. 224. Dr. Sioson opined that, based on the objective findings, no specific restriction to work-related activities were evident. Tr. 224. However, he also stated that, if one considered limitation of range of motion from pain, then Louis would be limited to sedentary work activity. Tr. 224.

### c. State Agency Reviewing Physicians

On November 16, 2009, state agency physician Esberdado Villanueva, M.D., reviewed the record and completed a Physical Residual Functional Capacity assessment. Tr. 234-41. Dr. Villanueva opined that Louis could perform medium work, i.e., could lift and/or carry 50 pounds occasionally and 25 pounds frequently and could stand/walk or sit for 6 hours in an 8-hour workday. Tr. 235. Dr. Villanueva also opined that Louis should never climb ropes, ladders, or scaffolds, and should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to his bronchitis. Tr. 236-38. On April 27, 2010, a second state agency physician, Maria Congbalay, M.D., reviewed the evidence and affirmed Dr. Villanueva's assessment. Tr. 270.

### 2. Mental Impairments

#### a. Treatment History

Louis sought treatment for his mental health issues at the Murtis Taylor Center during the period September 19 to December 9, 2008. Tr. 280-83. His treatment during this time was conservative and consisted of medication checks and four counseling sessions. Tr. 280-83. Louis' mental status examinations during each visit revealed unremarkable findings except for a blunted affect/mood. Tr. 280-83. Louis denied psychotic symptoms at each appointment. Tr. 280-83. At his appointment on November 11, 2008, he reported that he was stable, that his basic needs were being met, and that he was active with his church. Tr. 281.

On October 1, 2009, Louis' treating physician at Care Alliance, Tomas Gigena, M.D., provided a medical source statement regarding Louis' mental capacity. Tr. 232-33. Dr. Gigena, a general practitioner, opined that Louis had good abilities (ability to function in this area is satisfactory) in the following areas: dealing with the public and relating to co-workers. Tr. 232. Dr. Gigena also noted that Louis had fair abilities (ability to function in this area is moderately limited but not precluded) in the following areas: using judgment; responding appropriately to changes in routine settings; maintaining regular attendance and being punctual within customary tolerance; working in coordination with or proximity to others without being unduly distracted or distracting; dealing with work stress; maintaining appearance; socializing; behaving in an emotionally stable manner; management of funds/schedules; and leaving home on his own. Tr. 232-33. Dr. Gigena further found that Louis had poor abilities (ability to function is significantly limited) in the following areas: following work rules; maintaining concentration and attention for extended periods of 2 hour segments; functioning independently without special supervision; completing a normal workday/week without interruption from psychologically-based symptoms

and performing at a consistent pace without an unreasonable number and length of rest periods; understanding and carrying out even simple instructions; and relating predictably in social situations.  Tr. 232-33.  Dr. Gigena stated that his findings were based on unknown etiology of a "mental illness (schizophrenia)" and the fact that Louis attended special education classes as a child.  Tr. 233.

Furthermore, during the relevant period, in April 2011, Louis began treatment for depression at the Center for Families and Children ("CFC").  Tr. 284-96.  At his initial examination on April 19, 2011, Louis reported depression, sadness, and helplessness at times, as well as racing thoughts and memory problems.  Tr. 284.  He also "constantly repeated his being a 'slow learner.'"  Tr. 284.  The CFC developed a service plan for Louis, under which his primary goal was centered on receiving SSI.  Tr. 285.  Specifically, in response to the question, "What are the client's desired results? In the client's own words, how will they know when they have accomplished this goal?," Louis stated, "I want to get my disability check, and help my symptoms through medicine."  Tr. 285.  Louis also stated that his desired results included, "Get my Medicaid [and] SSI. Once I get those things, I am set."  Tr. 289.  Louis reported that he had a lawyer working on his SSI claim and that he needed to follow up with all the paperwork in order to accomplish his primary goal of receiving SSI.  Tr. 289.

    b.  **State Agency Consulting Physician**

On November 20, 2009, Louis underwent a consultative examination by David House, Ph.D., a state agency psychologist.  Tr. 242-50.  Louis reported that he last worked in 2008 for the Salvation Army during the Christmas season.  Tr. 244.  Louis acknowledged past drug use but stated that he had not abused drugs in years.  Tr. 244.  Dr. House noted that Louis appeared jittery and psychotic, and endorsed some delusional thought content, including auditory

6

hallucinations.  Tr. 245-46.  Upon examination, Dr. House noted that Louis was oriented but exhibited markedly limited judgment, concentration, and attention.  Tr. 246.  Dr. House attempted to administer an intellectual functioning examination but decided that Louis did not appear testable.  Tr. 247.  He stated that Louis' intellectual functioning was "quite low" but that it was more attributable to psychotic process.  Tr. 247.  Dr. House diagnosed Louis with paranoid schizophrenia and assessed a Global Assessment of Functioning ("GAF") score of 29.[4]  Tr. 248.  He opined that Louis had marked limitations in his ability to maintain attention and concentration, persistence, and pace to perform simple repetitive tasks, marked limitations in his ability to understand and follow instructions, marked limitations in his ability to withstand stress and pressure associated with day-to-day work activity, marked limitations in his ability to relate to others including fellow workers and supervisors, and marked limitations in his level of adaptability.  Tr. 248.

        c.     **State Agency Reviewing Physicians**

On December 3, 2009, state agency psychologist Tonnie Hoyle, Psy.D., reviewed the record and completed a Mental RFC Assessment and a Psychiatric Review Technique Form ("PRTF").  Tr. 251-68.  Dr. Hoyle opined that Louis was limited to performing simple, routine tasks that required no more than four steps and that involve limited interactions with co-workers and supervisors, minimal interaction with the public, and no arbitration, negotiation, or confrontation.  Tr. 251.  On March 4, 2009, Caroline Lewin, Ph.D., another state agency psychologist, affirmed Dr. Hoyle's findings and cited the fact that Louis had not had any changes to his symptoms or any new treatment.  Tr. 269.

---

[4] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)."

**C.     Administrative Hearing**

   **1.     Louis' Testimony**

On May 20, 2011, Louis appeared with counsel and testified at the administrative hearing before the ALJ. Tr. 33-49. He stated that he was unable to work because he has trouble concentrating, is a slow learner, and has schizophrenia. Tr. 36. Louis explained that his schizophrenia affects him because he is delusional, he "sees visions of things," and thinks that people are trying to hurt him. Tr. 36. Louis stated that medication helps his schizophrenia and concentration problems. Tr. 42.

Louis testified that he volunteered with the Salvation Army during the Christmas season of 2009 by ringing a bell at a collection stand to raise money for charity. Tr. 35. He stated that he worked eight-hour shifts and that he worked for approximately four or five weeks. Tr. 35. With regard to his activities of daily living, Louis stated that he watches television, reads, regularly attends church on Sundays, hosts a weekly Bible study at his home, and regularly participates in two additional Bible studies during the week. Tr. 37-39. Louis testified that he lives alone, prepares his own meals, and shops for groceries. Tr. 40, 45-46. He also stated that he attends Alcoholics Anonymous meetings on a weekly basis. Tr. 38-39.

   **2.     Vocational Expert's Testimony**

Mark Anderson (the "VE") appeared at the hearing and testified as a vocational expert. Tr. 49-55. He stated that Louis had previously worked as a general laborer (unskilled position at the medium exertional level), as well as a commercial cleaner (unskilled position at the heavy exertional level). Tr. 49-50. The ALJ asked the VE whether a hypothetical individual with Louis' vocational characteristics and the following limitations could perform Louis' past work or any other work in the national economy:

8

> [T]his individual could do light exertional work, with lifting and carrying of 20 pounds occasionally, 10 pounds frequently; stand and walk six out of eight hours, and sit for six out of eight hours; can do all posturals at least occasionally, but should avoid climbing ladders, ropes, scaffolds; should avoid concentrated exposure to pulmonary irritants; and should be limited to simple, routine work, with only superficial interactions with others . . . should not do work involving arbitration, or negotiation, or confrontation with other coworkers or the public.

Tr. 50-51. The VE testified that the hypothetical individual could not perform Louis' past relevant work but could perform other jobs that existed in significant numbers in the national economy, including: assembler of small products (109,000 jobs nationally, 6,000 jobs in Ohio, and 2,500 jobs locally); inspector and hand packager (245,000 jobs nationally, 22,500 jobs in Ohio, and 4,500 jobs locally); and vending machine attendant (138,000 jobs nationally, 8,000 jobs in Ohio, and 3,500 jobs locally). In response to an additional question by the ALJ, the VE testified that none of these jobs require more than four steps. Tr. 53.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2). In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV.  The ALJ's Decision

At Step One of the sequential analysis, the ALJ determined that Louis had not engaged in substantial gainful activity since July 16, 2009, the application date.  Tr. 12.  At Step Two, the ALJ found that Louis had the following severe impairments: depression, schizophrenia, hypertension, bronchitis, and a back impairment.  Tr. 12.  At Step Three, the ALJ found that Louis did not have an impairment or combination of impairments that met or medically equaled

10

one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[5] Tr. 20-22. The ALJ then determined Louis' RFC and found that he could perform light work with the following limitations:

> "[H]e can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can stand and/or walk 6 hours in an 8-hour workday; and can sit 6 hours in an 8-hour workday. The claimant can occasionally balance, crouch, crawl, kneel, stoop and climb ramps and stairs, but should never climb ladders, ropes or scaffolds. He should avoid concentrated exposure to pulmonary irritants. The claimant is limited to simple routing work with only superficial interaction with others. He should not perform work involving arbitration, negotiation or confrontation with other coworkers or with the public. The claimant cannot perform jobs that require more than four steps.

Tr. 14. At Step Four, the ALJ found that Louis was unable to perform any past relevant work. Tr. 20. At Step Five, after considering Louis' vocational factors, RFC, and the testimony of the VE, the ALJ found that Louis was capable of performing other jobs that existed in significant numbers in the national economy. Tr. 21. The ALJ thus concluded that Louis was not disabled. Tr. 31.

## V. Arguments of the Parties

Louis challenges the Commissioner's decision on three grounds. Louis contends that the ALJ failed to give appropriate weight to the opinion of his treating physician. He also contends that the ALJ failed to give appropriate weight to the opinions of both the examining consulting psychologist, Dr. House, and the examining consulting physician, Dr. Sioson.

In response, the Commissioner asserts that the ALJ properly evaluated the medical source opinions. The Commissioner argues that the ALJ properly evaluated the opinion of Louis' treating physician, as well as the opinions of the state agency consulting physicians.

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

11

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B.  The ALJ Properly Evaluated the Medical Source Opinions

#### 1.  The ALJ Properly Evaluated the Opinion of Louis' Treating Physician

Louis argues that the ALJ erroneously evaluated the opinion of Dr. Gigena under the treating physician rule.  Doc. 16, p. 8. Reviewing the record as a whole, the undersigned finds that the ALJ properly evaluated Dr. Gigena's opinion in accordance with the treating physician rule.

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  However, the ALJ is not obliged to set forth a detailed analysis with respect to each and every one of the factors listed above.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

As discussed above, Dr. Gigena, a general practitioner, completed a medical source statement for Louis regarding his mental capacity and opined that he had poor ability in the following areas: following work rules; maintaining concentration and attention for extended periods of 2 hour segments; functioning independently without special supervision; completing a

13

normal workday/week without interruption from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; understanding and carrying out even simple instructions; and relating predictably in social situations.  Tr. 232-33.  Dr. Gigena stated that his findings were based on unknown etiology of a "mental illness (schizophrenia)" and because Louis attended special education classes as a child. Tr. 233.

The ALJ evaluated Dr. Gigena's opinion, as well as the record as a whole, and reasonably assigned no weight to Dr. Gigena's opinion.  The ALJ explained that she gave no weight to Dr. Gigena's opinion because Dr. Gigena was not a psychiatrist and because his opinion regarding Louis's mental capacity was not supported by other evidence in the record.  Tr. 20.  The ALJ's explanation demonstrates that she properly considered the regulatory factors and discounted Dr. Gigena's opinion based on the specialization of the source, the supportability of the opinion, and the consistency of the opinion with the record as a whole.  The ALJ therefore stated good reasons for assigning less than controlling weight to Dr. Gigena's opinion and fulfilled her obligations under the regulations.  *See, e.g., Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason was brief but reached several of the factors an ALJ must consider when determining what weight to give non-controlling opinion); *Bledsoe v. Barnhart*, 2006 WL 229795, at *4 (6th Cir. 2006) ("The ALJ reasoned that Dr. Lin's conclusions are 'not well supported by the overall evidence of record and are inconsistent with other medical evidence of record.'  This is a specific reason for not affording controlling weight to Dr. Lin.").

The reasons provided by the ALJ for discounting Dr. Gigena's opinion are supported by substantial evidence.  Dr. Gigena opined that Louis had poor abilities in a number of mental

14

work-related areas, including relating to social situations and maintaining attention and concentration.  Tr. 232-33.  However, based on the treatment notes in the record from Dr. Gigena's office, it appears that Dr. Gigena, a general practitioner, treated Louis primarily for his physical conditions, which mainly consisted of management of Louis' hypertension medication.  Tr. 218, 220, 274-79, 302-05.  Considering the nature of their treatment relationship, it is noteworthy that Dr. Gigena did not explain the basis for his conclusions or indicate what medical findings supported his conclusions beyond stating that his opinion was based on a schizophrenia diagnosis of unknown origin and Louis' history in special education.  Tr. 233.  It is therefore unclear how Dr. Gigena, who is not a psychiatrist and apparently did not treat Louis for his mental impairments, arrived at his conclusions regarding Louis' mental capacity.  An ALJ is not required to accept an opinion from a treating physician that is conclusory and unsupported.  *See Anderson v. Comm'r Soc. Sec.*, 195 Fed. Appx. 366, 370 (6th Cir. 2006) ("The ALJ concluded, properly in our view, that the [treating physician's] treatment notes did not support and were inconsistent with his conclusory assertion that appellant was disabled."); *see also Kidd v. Comm'r of Soc. Sec.*, 283 Fed. Appx. 336, 340 (6th Cir. 2008) (citing *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994)) (holding that an ALJ need not credit a treating physician's conclusory opinions that are inconsistent with other evidence).

   Further, Dr. Gigena's opinion is inconsistent with other evidence in the record.  Treatment records from Care Alliance do not reflect that Louis had disabling mental limitations.  Tr. 218-20, 275-79, 302-06.  Similarly, treatment records from the Murtis Taylor Center do not show that Louis had any severe mental impairment.  Tr. 280-83.  In fact, at an appointment on November 11, 2008, Louis stated that his condition was stable.  Tr. 281.  Additionally, the state agency physician who reviewed the record in this case opined that Louis' mental impairments

did not rise to a disabling level. Indeed, Dr. Tonnie Hoyle opined that, despite his mental impairments, Louis could perform simple, routine tasks that required no more than four steps and that involve limited interactions with co-workers and supervisors, minimal interaction with the public, and no arbitration, negotiation, or confrontation. Tr. 251-68. Agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues. *See* 20 C.F.R. § 416.927. Finally, as noted by the ALJ, there is evidence in the record that Louis was able to perform a wide range of daily activities. Louis lived alone and cared for himself, watched television, read, shopped in stores, prepared his own meals, washed laundry, rode a bicycle, regularly attended church, hosted a weekly Bible study at his home, and participated in two additional Bible studies during the week. Tr. 37-39, 45-46, 181-83. All of this evidence supports the ALJ's determination to give less than controlling weight to Dr. Gigena's opinion.

In sum, the ALJ reviewed the entire record, weighed the evidence, and concluded that Louis retained the ability to perform some work. In reaching the determination, the ALJ applied the correct legal standard and provided good reasons for assigning less than controlling weight to the opinion of Dr. Gigena. Substantial evidence supports this determination. Based on the applicable standard of review set forth above, the ALJ's decision is therefore affirmed.

   **2. The ALJ Properly Evaluated the Opinions of the State Agency Consulting Physicians**

Louis also argues that the ALJ failed to give appropriate weight to the opinions of the consulting psychologist, Dr. House, and the consulting physician, Dr. Sioson. Doc. 16, pp. 7, 11. These arguments are also meritless.

As set forth above, federal regulations establish the hierarchy of medical opinion evidence. At the top of the hierarchy are opinions provided by the claimant's treating source.

*See Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. §§ 404.1527(c) (2), 416.927(c)(2). Opinions from these sources are entitled to controlling weight so long as the opinion is well supported by acceptable medical evidence and not inconsistent with the other substantial evidence of record. *Wilson*, 378 F.3d at 544. Next in the hierarchy are opinions issued by examining physicians. 20 C.F.R. §§ 404.1527(c), 416.927(c). Opinions from medical professionals who have only examined the claimant on one occasion are not automatically entitled to any special degree of deference. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994). Finally, the adjudicator must consider the findings of non-examining physicians. 20 C.F.R. §§ 404.1527(e), 416.927(e). Opinions from non-examining physicians are not entitled to any special degree of deference. *Id.* However, the regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, as these individuals are "highly qualified" and are "experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2) (i); *see Barker*, 40 F.3d at 794.

Here, Drs. House and Sioson were not treating physicians and, as such, their opinions were not entitled to any special deference. *See, e.g., Oliver v. Comm'r of Soc. Sec.*, 415 F. Appx. 681, 684 (6th Cir. 2011) (noting that the brief nature of the relationship militates in favor of granting the examining source opinion limited weight); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 452 (6th Cir. 1986) (ALJ may reject opinion of one-time examining psychologist). Thus, the ALJ did not error simply because he assigned less than controlling weight to those opinions.

Moreover, the ALJ properly evaluated the opinions of the state agency consulting physicians in accordance with the applicable regulations. Tr. 27-28. *See* 20 C.F.R. § 416.927. After considering factors set forth in the regulations, including supportability of the opinion and

consistency of the opinion with the record as a whole, the ALJ concluded that no weight should be given to Dr. House's opinion.  Tr. 20.   Substantial evidence supports this determination.  For example, the ALJ noted that a GAF score of 29 would likely require hospitalization and Louis had no history of psychiatric hospitalizations.  Tr. 20.  Likewise, the ALJ noted that Louis received only minimal treatment for his mental health issues and functioned at a high level, which is inconsistent with the severe mental limitations found by Dr. House.  Tr. 20.  Thus, under the applicable standard of review, the ALJ's determination must be affirmed.[6]

The ALJ also appropriately considered and discounted Dr. Sioson's opinion.  Again, the ALJ considered Dr. Sioson's opinion using the factors set forth in the regulations, including the supportability of the opinion and the consistency of the opinion with the record as a whole, and concluded that no weight should be given to Dr. Sioson's opinion that Louis is limited to sedentary work.  Tr. 20. *See* 20 C.F.R. § 416.927(c).  Substantial evidence also supports this determination.  In his assessment, Dr. Sioson stated that, based on the objective findings from the examination, no specific restriction to work-related activities were evident.  Tr. 224.  However, he also stated that, if one considered Louis' subjective complaints of pain, then Louis would be limited to sedentary work activity.  Tr. 224.  Dr. Sioson's opinion is internally inconsistent and is not supported by his own objective findings, as his examination revealed normal findings, including no gross deformity, negative straight leg raising test, and range of motion within normal limits.  Tr. 223-24.  Further, treatment notes from Care Alliance, where Louis sought treatment for his physical infirmities, demonstrated that Louis could perform a range of light exertional work activity.  Tr. 20.  For example, at an appointment at Care Alliance on March,

---

[6] Furthermore, contrary to Louis' contention, the ALJ did not improperly act as her own medical expert by rejecting Dr. House's opinion.  "An ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. Appx. 149, 157 (6th Cir. 2009).  Here, the ALJ did not act as a medical expert; she properly evaluated Dr. House's opinion in accordance with the regulations in order to establish Louis' RFC.

15, 2011, the examiner noted the Louis had a normal range of motion in the low back and negative straight leg raising test. Tr. 305. In addition, the examiner noted that Louis had normal motion in the hips, knees, shoulders, elbows, and wrists. Tr. 305. The examiner concluded that Louis had "no physical disability." Tr. 305. All of this evidence supports the ALJ's determination to reject Dr. Sioson's limitation of sedentary work. The ALJ's determination is therefore affirmed.

## VII. Conclusion

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff William E. Louis' application for SSI is **AFFIRMED**.

Dated: July 18, 2013

Kathleen B. Burke
United States Magistrate Judge